JUDGE SULLIVAN

09 CV 7535

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ROBERT M. GUTKOWSKI,

       Plaintiff,

  -against-

GEORGE STEINBRENNER III,

       Defendant.
--------------------------------------------------------X

**COMPLAINT**

Case Number:



**COMES NOW**, Plaintiff, Robert M. Gutkowski ("Plaintiff" or "Gutkowski"), by and

through his undersigned attorneys, The Law Offices of Neal Brickman, P.C., 317 Madison

Avenue, 21st Floor, New York, New York 10017, and as and for his Complaint against

defendant, George Steinbrenner III ("Steinbrenner" or "Defendant") states and alleges the

following:

## NATURE OF THE CLAIM

1.    This is an action for breach of contract, fraud in the inducement, quantum meruit,

and unjust enrichment.  Plaintiff is a distinguished professional in the field of sports television,

marketing, and management with many years of experience.  In 1996 Plaintiff came to

Steinbrenner, principal owner of the New York Yankees baseball team, with an idea for creating

a Yankees television network, correctly foreseeing, that if Defendant did not soon create such a

network, the Yankees would have very little leverage in their local television broadcast and cable

rights negotiations.  As a result of that and subsequent meetings, The Yankees Entertainment and

Sports Network ("YES") debuted on March 19, 2002 with an enterprise value of Eight Hundred

Forty-Five Million Dollars ($845,000,000) at inception.  It has since been valued at more than

Three Billion Dollars ($3,000,000,000). By oral agreement Steinbrenner promised Plaintiff that if such a network came into existence, Plaintiff would be responsible for building it and would have a role in the network as long as it existed or, otherwise, be compensated for his efforts and contributions. Defendant promised Plaintiff that if the network he conceived came into existence, after he built it, he would run it or be involved in it in some significant capacity. Despite this agreement, after the network's creation, Plaintiff was not hired to run the network, but rather was hired only occasionally as an outside consultant -- a breach of the agreement which was only compounded when even such sporadic retention stopped altogether. In addition, in order to induce Plaintiff to give his unique idea, and render services otherwise unavailable to Defendant, Defendant knowingly lied to Plaintiff, promising that Plaintiff would be a significant part of the network, of which he was the conceptual architect. Even at that time, Defendant had no intention of fulfilling his promise but made such a promise solely to induce Plaintiff to provide services to Defendant and not to bring his idea to other parties. Defendant benefited from Plaintiff's idea, knowledge, and services, never intending to provide Plaintiff with proper compensation. Plaintiff, therefore, seeks an award of compensatory and punitive damages, together with the costs of this action, including Plaintiff's reasonable attorneys' fees.

## PARTIES

2.      Robert M. Gutkowski was the President of the MSG Network from 1985 through 1991 and the President of the Madison Square Garden Corporation from 1991 through 1994. As President of the MSG Network, Mr. Gutkowski was the architect behind the ground-breaking $486 million, twelve-year deal to telecast New York Yankees baseball from 1989 through 2000.

2

Mr. Gutkowski also has held the position of Director of Programming at ESPN and various executive level positions at Paramount and NBC Sports. From 1995 through 1999 he was a member of The Marquee Group, a sports and entertainment production, marketing, and representation firm that he co-founded. He resides at 20 Fox Hunt Lane, Cold Spring Harbor, New York, 11724.

3.      George Steinbrenner III is owner and former principal owner and executive of Major League Baseball's New York Yankee's baseball team. Upon information and belief, Steinbrenner is also a principal shareholder of YES, with an approximate 30% stake. He resides at Legends Field, 1 Steinbrenner Way, Tampa, Florida 33614.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship as between the parties, and the matter in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court. Venue is proper in this district because the events and circumstances giving rise to the claims asserted herein took place within this district.

## FACTUAL BASIS

5.      During the years 1989 through 2000, local television broadcast and cable rights to New York Yankees baseball games were owned by the MSG Network. Plaintiff was, in fact, the architect of the contract underlying that ownership.[1] When those rights were set to expire at the

---

[1] Pursuant to this deal, for the years 1989 and 1990, the MSG Network had the local television cable rights to 75 Yankees games. By a separate agreement, WPIX had the broadcast rights to the other 75 games for those years. Starting in 1991, and through 2000, MSG had the local television broadcast and cable rights to all 150 games.

end of the 2000 baseball season, the parties (i.e. MSG and the Yankees), as per practice,
contemplated that there would be a negotiation of a new rights agreement.

6.     In 1995 ITT and Cablevision purchased the MSG Network, and, therefore,
assumed the local broadcast and cable rights to the Yankees baseball games.  The terms and
conditions of those rights remained the same under Cablevision as they had under the MSG
Network and were still up for renegotiation after the 2000 season.  Cablevision subsequently
bought out ITT, meaning that Cablevision had, through its ownership of the MSG Network, a
100% ownership of Yankees local television broadcast and cable rights.  As such, Cablevision
controlled the local television broadcast and cable rights to all metropolitan New York
professional sports teams, with the exception of the New York Giants and the New York Jets.
Through arbitration, one (1) year was added to that rights deal, extending the contract through
the end of the 2001 baseball season.

7.     Cablevision was able to control distribution of these games through its ownership
of the television networks, The MSG Network and its sister channel, Fox Sports Net New York.

8.     In December of 1996, Plaintiff met with Steinbrenner at Steinbrenner's office in
Tampa, Florida.  At that time, Cablevision had just purchased the MSG Network.  As an industry
insider, Plaintiff correctly foresaw that this deal would have serious negative financial
consequences to Steinbrenner and the Yankees and their future local television rights
negotiation.  Plaintiff also perceived that Cablevision now had a veritable monopoly on the local
television broadcast and cable rights of New York professional sports.  Plaintiff advised
Steinbrenner that, therefore, the Yankees would have very little leverage in renegotiating their
local television broadcast and cable rights after 2000.  Plaintiff quoted Cablevision executives

4

who had remarked, during the due diligence of the sale of Madison Square Garden Corporation, who owns the MSG Network, directly to Plaintiff, that Cablevision would, "crush George [Steinbrenner] in the next Yankees TV negotiations after 2000."

9.     Once Plaintiff explained the situation to him, Steinbrenner agreed that the Yankees needed to consider alternative local television broadcast and cable options, though he was unsure of what those options might be.

10.     In that same meeting, Plaintiff presented to Steinbrenner the idea of starting a Yankees owned and operated network as a means of gaining negotiating leverage over Cablevision. Plaintiff said to Steinbrenner, "The Yankees have a unique opportunity to have team equity create distribution equity. The Yankees can do what MSG did twenty (20) years ago with the Knicks and Rangers by using team equity to create distribution equity." Steinbrenner was very intrigued by the idea, though he himself did not know how it could be effected.

11.     Steinbrenner asked that Plaintiff work with the Yankees to figure out the viability of starting a new network and further asked Plaintiff to meet with David Sussman ("Sussman"), General Counsel of the New York Yankees. Steinbrenner told Plaintiff that he would be compensated fairly for his efforts and that if, in fact, using Gutkowski's ideas, the Yankees did create a network, Plaintiff would be the one to build it and, afterward, would either run the network or, at a minimum, have a senior management position or be fairly compensated for his idea and efforts.

12.     In February 1997, Plaintiff met with Sussman in New York. Plaintiff advised Sussman of Cablevision's monopoly and stated his concern about Steinbrenner and the Yankees being "crushed" by Cablevision in negotiations for their television broadcast and cable rights

5

after the 2000 season. Plaintiff told Sussman that the Yankees needed to look at alternative local television broadcast and cable options after the year 2000. Sussman strongly agreed. Plaintiff then reiterated his proposal that the Yankees should look into creating its own network. Sussman was also very interested in the idea, though he, like Steinbrenner, did not know how to go about creating a television network.

13.     Three months later, in May 1997, Plaintiff again met with Steinbrenner in New York City. Steinbrenner was becoming more and more interested in starting a Yankees television network. Steinbrenner further declared that they wanted to use the hypothetical network to get "a billion dollars" from Cablevision for a ten (10) year extension of Yankees local television broadcast rights. Plaintiff and Steinbrenner decided to hold off discussing further development of a Yankees network until they could get an idea of the bargaining position Cablevision would adopt.

14.     In October 1997, Bortz & Company, Inc., a firm retained by Defendant to value the Yankees' local television broadcast and cable rights, wrote to him to tell him that the valuation of those rights was now in the upper range, or higher, of the assessment they had done the previous year, in which they valued those rights between $811 and $988 million.

15.     In February 1998, Steinbrenner called upon Gutkowski's industry expertise and requested that he prepare a memo to list and explain all of the local television broadcast and cable options available to the Yankees after the year 2000.

16.     On or about March 5, 1998, Plaintiff sent a memo to Steinbrenner providing him with seven (7) detailed Yankees local television broadcast and cable options for the future. The first option was the creation of a Yankees owned and operated television network. Included with

6

this option were thorough five (5) and ten (10) year business plans laying out network creation and operations including specifics such as production, cable and advertiser sales, and marketing. Plaintiff also suggested that Steinbrenner meet with the New Jersey Nets, of the National Basketball Association, raising the concept that the Nets could be included as a part of the new network so as to diversify the network's appeal and to offer programming even in baseball's off-season.  Plaintiff strongly advised Steinbrenner to acquire local television broadcast and cable rights to their games, which would further strengthen the Yankees' bargaining position with Cablevision.

17.    On or about March 10, 1998, Plaintiff and two of his partners at The Marquee Group, legendary and highly respected sports television executives Chet Simmons and Mike Trager, made a presentation entitled, "The New York Yankees & The Marquee Group: Maximizing Television Revenues" to George Steinbrenner III; Hal Steinbrenner; Lonn Trost, Executive Vice President of the Yankees; and Yankees executive Steve Swindal at the Yankee offices at Legends Field in Tampa, Florida.  The presentation explained, in depth, how to build a Yankees television network.  Plaintiff, as architect of the network's model, covered all the facets of the implementation and management of the proposed Yankees network.

18.    Steinbrenner was impressed and asked Plaintiff to move forward on Phase One of Plaintiff's proposed plan.

19.    Phase One of the plan included developing viable local television broadcast and cable options, for the execution of which The Marquee Group would charge twenty five thousand dollars ($25,000) per month for a minimum of six (6) months.  While Steinbrenner never signed the proposal he specifically requested that Plaintiff proceed under the terms --

7

namely Phase One -- of the contract. Nevertheless, Steinbrenner only paid The Marquee Group for one month's worth of compensation -- or $25,000 -- for its work. At the time, Steinbrenner claimed that he was uncertain if he would ultimately choose to create a Yankees network, but told Plaintiff that if he did decide to start a network, Plaintiff would be the one to build it and either run it or be significanltly involved in it. He also promised that, in any event, Gutkowski would be compensated for his idea and efforts. Steinbrenner also said to Plaintiff and his partners, "You are my guys, if it goes forward, I will do it with you." Plaintiff and his partners shook Steinbrenner's hand and departed to begin work on Phase One.

20.     Based upon that agreement and the specific -- albeit knowingly false -- promises of Defendant, Plaintiff, as the creator of both the concept for the network and the network's then current, and its eventual, formulation, began laying the groundwork for the creation of a Yankees owned and operated television network.

21.     In furtherance of the parties' agreement, on or about March 23, 1998, Plaintiff sent a letter to Steinbrenner in Tampa describing the duties he was then performing on behalf of a potential Yankees network. These duties included, but were not limited to, 1) analyzing potential strategic and financial media companies as equity and distribution partners; 2) identifying key decision-makers at such companies with whom Steinbrenner should meet; and 3) continuing to develop a detailed financial *pro forma* for a Yankees owned and operated television network, including calculations for advertising and affiliate revenues, organization and staffing. This letter also suggested and detailed certain specific steps to be taken next, including a press release -- with a suggested date of April 1, 1998 -- to announce a partnership between the

Yankees and The Marquee Group, which would enable Gutkowski to conduct meetings on the Yankees' behalf.

22.     While Steinbrenner declined to create or issue such a press release, he repeatedly assured Plaintiff that he would build the network with Plaintiff and that Plaintiff would run the network, or else be, and stay, significantly involved in the network.  Based upon these specific representations, Plaintiff continued diligently working for the benefit of Steinbrenner and the New York Yankees toward the creation of what ultimately became the YES network.

23.     On or about May 31, 1998, Plaintiff received a consulting agreement from Lonn Trost, Executive Vice President of the Yankees, and Sussman's successor, stating, in part, that Plaintiff would consult for the Yankees regarding, "all matters pertaining to the Yankees' future television rights, including, by way of illustration and not limitation, consulting, advising and assisting the Yankees in evaluating the Yankees' Television Rights.  Additionally, as required and requested by the Yankees, [Plaintiff] will prepare and/or assist in the preparation of financial pro forma with respect to the Yankees' television rights opportunities."  Plaintiff was assured that this consulting agreement was merely the beginning of a much deeper involvement with the new Yankees network.

24.     The term of this consulting agreement was six (6) months, after which time, Plaintiff rightfully expected that, based upon agreement with Steinbrenner, Plaintiff would continue to be significantly involved with the network which was ultimately named YES.

25.     Notwithstanding Steinbrenner's promises and assurances, after his initial consulting efforts, Plaintiff was not contracted or hired to work for the network he created before it debuted several years later despite repeatedly contacting Defendant and requesting to be

9

involved with building the network that he had created and then designed, as he was specifically promised.

26.     After receiving no word from Defendant for some time regarding Plaintiff's continued involvement with building the new network, Plaintiff learned that Steinbrenner went to IMG, another sports and entertainment marketing firm, to explore the possibility of starting his own network.  Ultimately, Defendant, using the fruits of Plaintiff's labor, started the YES network with the financial assistance of several private equity groups.

27.     Gutkowski left The Marquee Group in 1999, and shortly thereafter it was sold to SFX.

28.     On or about March 19, 2002, YES first aired with Leo Hindery, Jr. as its Chief Executive Officer.

29.     By use of repeated and ongoing assurances, *inter alia*, promising Plaintiff that he would be allowed to be involved with YES, possibly even as CEO, and that Plaintiff would, in any event, be compensated for originating the idea for YES and creating the blueprint for its creation, Steinbrenner repeatedly and consistently assured Plaintiff that he would be taken care of.  As a result, Plaintiff chose, at that time, not to pursue legal action.  "My word means everything to me," was what Defendant told Plaintiff and what Plaintiff firmly believed.

30.     In or about April 2002, YES filed suit against Cablevision citing a violation of applicable laws.  At that time, Randy Levine ("Levine"), President of the Yankee's baseball team, called Plaintiff requesting a meeting at Yankee Stadium.  That meeting was attended by Plaintiff, Levine, and Lonn Trost.  Speaking of the lawsuit, Mr. Trost said to Plaintiff, "We need you.  Man, do we need you."  Subsequently, from approximately October 2003, through March

10

2004, Plaintiff was retained by YES to act as a consultant in the lawsuit. Once again, Defendant needed Plaintiff to help dig him and the Yankees out of a hole.

31.     In eliciting Plaintiff's aid in the lawsuit, Levine, on behalf of Steinbrenner, also gave Plaintiff assurances that Plaintiff was Steinbrenner's choice to replace Mr. Hindery as CEO of YES.

32.     When Leo Hindery, Jr. resigned as CEO of YES in early 2004, Steinbrenner and Levine repeatedly spoke with Plaintiff about his assuming the CEO position at YES. Levine said to Plaintiff, "it is George and my dream that you run YES." On a subsequent phone call, Defendant said to Plaintiff, "I want you to get this; you're the best in the business."

33.     Despite such discussions, in September 2004 Tracy Dolgin replaced Leo Hindery, Jr. as the Chief Executive Officer of YES.

34.     On or about November 1, 2004 Plaintiff received a two (2) year consulting agreement from YES, which was due to expire on or about November 1, 2006, presumably again to pre-empt any legal action by Mr. Gutkowski against Defendant for his prior decisions to improperly preclude Plaintiff from active participation with YES. That Plaintiff, after coming in second place in a search for a Chief Executive Officer, should be given a consulting agreement was unprecedented. In entering into this consulting agreement, Defendant continued to make misrepresentations to Plaintiff in order to induce service from Plaintiff for Defendant's benefit and to avoid possible legal action from Plaintiff.

35.     The length of the consulting agreement, two (2) years, was, according to Levine, supposed to coincide with the fact that, according to Levine, it was generally thought that Tracy Dolgin would only be CEO of YES for about two (2) years. Levine again reiterated his wish that

11

Plaintiff be CEO of YES, without delivering on or formalizing those statements and with the knowledge -- on the part of Defendant -- that such statements were false when made.

36.    Over the course of the latest consulting agreement, it became clear to Plaintiff that no one at YES was making even the pretense of considering his suggestions. No one from YES sought out his counsel or in any way used Plaintiff in any substantive manner as contemplated by the consulting agreement. Feeling embarrassed about the meaningless position he had been relegated to, but armed with assurances of future meaningful work and promises that he would be fairly compensated for his prior efforts, on or about February 10, 2005, Plaintiff instigated a buyout of the previous November 2004 consulting agreement.

37.    In 2007, Plaintiff had a meeting with Levine in which Plaintiff asked, in accordance with past promises and assurances, that he be fairly compensated, in light of both Plaintiff's agreement with Steinbrenner and the fact that Plaintiff was the architect for YES. Levine told Plaintiff that they (i.e. Steinbrenner and the Yankees) would "look to make something happen." Despite further assurances that they would "do the right thing," Defendant never again contracted, hired, or otherwise involved Plaintiff in any way with the network he conceived of and created the model for, nor did they ever compensate Gutkowski for the reasonable value of his contribution to the creation and implementation of the YES network.

38.    Despite repeated and consistent inquiries and Defendant's repeated promises, Plaintiff has not been fairly compensated for the work he did on behalf of Defendant nor has he been involved, as he was promised, with YES since February 2005. One measure of the fair and reasonable value of Plaintiff's service is the 2-3% equity interest traditionally paid to persons providing the kind of services provided by Plaintiff to Defendant.

12

## FIRST CLAIM
### Fraud in the Inducement
### (Gutkowski against Defendant)

39.    Plaintiff realleges, restates and reiterates each and every allegation contained in paragraphs 1 through 38, set forth above, as if stated fully herein.

40.    Creating a Yankees owned and operated network has been widely lauded as an intelligent and innovative move. At no point did Steinbrenner, regarded for his business acumen, conceive of creating a Yankees television network.   The idea and plan was solely Mr. Gutkowski's.

41.    Plaintiff came to Defendant with the unique idea for a Yankees network at a time when Defendant and the Yankees would have been in a extremely unfavorable position with regard to their local television broadcast and cable rights. Steinbrenner told Plaintiff that, if he decided to create a Yankees television network, Plaintiff would be and stay involved in that network and that he would, in all circumstances, be fairly compensated for his efforts. As a direct consequence of this assurance, Plaintiff labored diligently toward the creation of YES. Plaintiff formulated detailed business plans covering each and every aspect of YES' implementation and management. He cultivated contacts and developed viability schemes and options, even pursuing dialogue about the New Jersey Nets' television rights.

42.    While performing these services, Plaintiff forewent the opportunity to create the network himself or to bring the idea to others.

43.    Steinbrenner and the Yankees retained Plaintiff's services over the years up to and after YES' inception. Despite Plaintiff's induced patience and Defendant's repeated assurances,

13

Plaintiff was denied the fair compensation, which, under agreement, was rightfully his as a result of these efforts.

44.    Defendant knowingly and continuously misrepresented the fact that Plaintiff was going to run or even be a part of YES. In reasonable reliance on such representations -- which were made to induce Plaintiffs' forbearance from acting -- Plaintiff labored on Defendant's behalf.

45.    Absent such assurances, Plaintiff would not have worked on behalf of the Defendant toward the creation of YES, would not have provided services to YES when it got in trouble after its creation, and Plaintiff would have moved sooner to protect his earned rights.

46.    Defendant had no intention of fulfilling the agreement with Plaintiff, as his subsequent behavior demonstrates. Defendant knew that his promises and assurances were false when he made them.

47.    Such misrepresentations were made in order to induce Plaintiff initially to draw up plans for the creation of YES because Defendant did not posses the knowledge or ability to create such a television network himself and keep the creation of YES in-house; and later to induce Gutkowski to provide services for YES; and later to forestall Plaintiff from taking legal action to protect his rights and obtain the benefits of his ideas and labors that had previously been promised to him.

48.    After inducing reliance in Plaintiff, Defendant profited by Plaintiff's labor yet failed and refused to give Plaintiff his due and proper compensation.

49.    After the buyout of the November 2004 consulting agreement, Plaintiff waited patiently to be given proper compensation for his idea and for Defendant to do, as he promised,

14

"the right thing." Despite Defendant's repeated assurances, upon which Plaintiff relied, since the aforementioned buyout Plaintiff has not been employed by or contracted to work for Defendant. Nor has Plaintiff received fair compensation for his idea and work.

50.     Plaintiff relied, to his detriment, upon the agreement he had made with, and assurances he received from, the Defendant.

51.     At all times, Defendant acted knowingly and intentionally.  Plaintiff made good faith requests to be given what by right and by agreement was his due -- fair and reasonable compensation for his ideas and labor.

52.     The acts and events described above constitute fraud in the inducement.  As a direct and proximate result of this conduct, Plaintiff has suffered injury and harm.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendant for compensatory damages in an amount to be determined at trial, but in no event less than Eighteen Million Dollars ($18,000,000.00); punitive damages in an amount to be determined at trial, but in no event less than Twenty Million Dollars ($20,000,000.00); the costs and disbursements of this action (including reasonable attorneys' fees), and any such other and further relief to Plaintiff as this Court deems just, fair, and proper.

## SECOND CLAIM
### Breach of an Express Contract
### (Gutkowski against Defendant)

53.     Plaintiff realleges, restates and reiterates each and every allegation contained in paragraphs 1 through 52, set forth above, as if stated fully herein.

54.     Steinbrenner entered into an agreement with Plaintiff whereby -- both for originating the idea for a Yankees network and for Plaintiff's continued work toward the creation and implementation of the network -- Plaintiff would be a compensated part of that network.

55.     Plaintiff was never fairly compensated for his contribution to the creation and implementation of the network.

56.     Plaintiff used his experience and insight as an industry insider and worked diligently to lay the foundations for YES. Plaintiff performed this work solely because of the agreement he reached with Steinbrenner whereby Plaintiff would be and remain a part of YES and that he would, in any event, be compensated for his idea and efforts.

57.     Defendant only sporadically formally retained Plaintiff's services, never granting Plaintiff his rightful and proper place within YES or his rightful compensation, despite the ongoing and repeated assurances of the Defendant that Plaintiff would be a compensated part of YES at all times during its existence and would be duly rewarded for its origination.

58.     Out of respect for Steinbrenner and the past and ongoing representations that he would be provided compensation, Plaintiff waited patiently to receive the fair compensation he was promised, possibly in the form of a small piece of equity in the network he originated. Since the February 2005 buyout of the November 2004 consulting agreement Plaintiff has not been contracted by, or hired to work for, YES, Yankee Global, or Steinbrenner, nor has he been given any equity in YES, or in any other way fairly compensated for his idea and services, constituting a breach of the agreement between Steinbrenner and Plaintiff.

16

59.     In 2001, The New York Daily News ran a story entitled, "Boss Says No To YES Architects" in which the genesis of YES was described accurately as being Plaintiff's idea and how Steinbrenner moved forward with the construction of YES without Gutkowski.

60.     Defendant's actions constitute a breach of his agreement with Plaintiff.  As a result of the breach of contract as aforesaid, Plaintiff has suffered damages, including, but not limited to, lost wages, lost business opportunities, loss of reputation, and pain and suffering.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendant for compensatory damages in an amount to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00), the costs and disbursements of this action (including reasonable attorneys' fees), and any such other and further relief to Plaintiff as this Court deems just, fair, and proper.

### THIRD CLAIM
#### Unjust Enrichment
#### (Gutkowski against Defendant)

61.     Plaintiff realleges, restates and reiterates each and every allegation contained in paragraphs 1 through 60, set forth above, as if stated fully herein.

62.     Defendant reaped the benefits of information and services, otherwise unavailable to him, provided by Plaintiff.

63.     Plaintiff has lost time and energy providing those services and information to the Defendant.  Plaintiff forewent other possible business opportunities to provide those services.  Furthermore, Plaintiff rightfully and reasonably expected, based upon agreement and assurance

17

by and with the Defendant, to be involved with YES and fairly compensated for providing those services, ideas, and information.

64.     Defendant ultimately refused, and continues to refuse, however, to grant Plaintiff the fair, proper, and mutually agreed upon value of his labor on Defendant's behalf, contracting him as an outside consultant to lull him into the belief that he would eventually be fairly compensated.

65.     Plaintiff, from 1996 onward, performed services for Defendant, including, inter alia, the conceptual creation and formation and organization of what is now known as the YES network.

66.     Defendant accepted these services from Plaintiff and, in fact, encouraged him to not only continue providing services, but also to provide additional services.

67.     Plaintiff performed all such duties and services with the expectation of compensation therefor.

68.     The product of Plaintiff's labor, YES is a currently airing television network valued at more than Three Billion Dollars ($3,000,000,000.00).

69.     Defendant has been unjustly enriched to the detriment of Plaintiff.

70.     Since the buyout of the November 2004 consulting agreement, ending Plaintiff's affiliation with YES, Plaintiff has requested reasonable and rightful compensation for the aforementioned information and services.  He has been denied such compensation.

        **WHEREFORE,** Plaintiff respectfully demands judgment against Defendant for compensatory damages in an amount to be determined at trial, but in no event less than Eighteen Million Dollars ($18,000,000.00); punitive damages in an amount to be determined at trial, but in

no event less than Eighteen Million Dollars ($18,000,000.00); the costs and disbursements of this action (including reasonable attorneys' fees), and any such other and further relief to Plaintiff as this Court deems just, fair, and proper.

## FOURTH CLAIM
### Quantum Meruit (Promissory Estoppel)
### (Gutkowski against Defendant)

71.     Plaintiff realleges, restates and reiterates each and every allegation contained in paragraphs 1 through 70, set forth above, as if stated fully herein.

72.     Acting in express and detrimental reliance on promises made by Defendant, Plaintiff provided Steinbrenner with information and services that were otherwise unavailable to him. After Plaintiff initially contacted Defendant in order to bring Defendant his unique idea, Defendant specifically requested further services and information, which were provided in expectation of promised compensation.

73.     Plaintiff has not been compensated for either the origination of the YES network, or for his labor on Steinbrenner's and the Yankees' behalf.

74.     The fair and reasonable value of these services is Eighteen Million Dollars ($18,000,000).

75.     Steinbrenner promised Plaintiff that he would be compensated for his ideas and services. Plaintiff relied upon those promises to his detriment. The promises continued at least through 2004.

76.     In contravention of his promises, Defendant has refused to provide Plaintiff with his fair, proper, and duly owed compensation.

19

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendant for compensatory damages in an amount to be determined at trial, but in no event less than Eighteen Million Dollars ($18,000,000.00); the costs and disbursements of this action (including reasonable attorneys' fees), and any such other and further relief to Plaintiff as this Court deems just, fair, and proper.

### FIFTH CLAIM
### Quantum Meruit (Breach of a Contract Implied in Fact)
### (Gutkowski against Defendant)

77.     Plaintiff realleges, restates and reiterates each and every allegation contained in paragraphs 1 through 76, set forth above, as if stated fully herein.

78.     A contract in fact arises from inferences that may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct. Furthermore, the law states, an agreement by conduct does not differ from an express agreement except in the manner by which its existence is established. In this instance, Plaintiff acted in a manner befitting his agreement with Defendant, i.e., laying the foundation for the YES network and providing support for the network whenever asked to do so.  Defendant, meanwhile, acted in a manner befitting his agreement with Plaintiff by accepting Plaintiff's services and information on an ongoing basis.

79.     The actions conducted by both Plainitff and Defendant constitute a contract implied in fact.

80.     The fair and reasonable value of services provided by Plaintiff to Defendant is Eighteen Million Dollars ($18,000,000).

20

81.   Defendant has refused to provide fair and reasonable compensation to Plaintiff, and is thereby in breach of a contract implied in fact.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendant for compensatory damages in an amount to be determined at trial, but in no event less than Eighteen Million Dollars ($18,000,000.00); the costs and disbursements of this action (including reasonable attorneys' fees), and any such other and further relief to Plaintiff as this Court deems just, fair, and proper.

## JURY DEMAND

82.   Plaintiff respectfully demands that this case be tried before a jury.

Dated: New York, New York
       August 28, 2009

                        Respectfully submitted,

                        THE LAW OFFICES OF NEAL BRICKMAN, P.C.

                        Attorneys for Bob Gutkowski

                By:     _____

                        Neal Brickman (NB 0874)
                        317 Madison Avenue, 21st Floor
                        New York, New York 10017
                        Neal@brickmanlaw.com