UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————

№ 09 Civ. 7535 (RJS)

———————

ROBERT M. GUTKOWSKI,

Plaintiff,

VERSUS

GEORGE STEINBRENNER III,

Defendant.

———————

MEMORANDUM AND ORDER
January 26, 2010

———————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Robert M. Gutkowski ("Plaintiff" or "Gutkowski") brings this diversity action against Defendant George Steinbrenner III ("Defendant" or "Steinbrenner"). Plaintiff alleges that after presenting Defendant with the idea of creating what ultimately became the Yankees Entertainment and Sports Network (the "YES Network" or "YES"), Defendant failed to abide by the terms of an oral agreement under which Plaintiff would "have a role in the network as long as it existed, or, otherwise[] be compensated for his efforts and contributions." (Compl. ¶ 1.) Plaintiff further alleges that Defendant "knowingly lied" to Plaintiff "in order to induce Plaintiff to give his unique idea." (*Id.*) Pursuant to these allegations, Plaintiff asserts common law claims under New York law for breach of contract, unjust enrichment, quantum meruit, and fraud in the inducement.

Before the Court is Defendant's motion to dismiss, with prejudice, Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court grants Defendant's motion.

## I. BACKGROUND

### A. Facts[1]

Plaintiff describes himself as a "distinguished professional in the field of sports television, marketing, and management with many years of experience." (*Id.* ¶ 1.) Defendant is the "owner and the former principal owner and executive" of the New York Yankees ("the Yankees"). (*Id.* ¶ 3.)

#### 1. The December 1996 Meeting with Defendant

Plaintiff first met with Defendant in December 1996. (*Id.* ¶ 8.) At that time, the Yankees had an agreement with the Madison Square Garden Network (the "MSG Network"), pursuant to which the MSG Network possessed the local television and cable rights to Yankees games. (*Id.* ¶ 5 & n.1.) The MSG Network, however, had been purchased by Cablevision in 1995, "meaning that Cablevision had, through its ownership of the MSG Network, a 100% ownership of Yankees local television broadcast and cable rights." (*Id.* ¶ 6.)

Plaintiff alleges that, "[a]s an industry insider, [he] correctly foresaw that this deal would have serious negative financial consequences to Steinbrenner and the Yankees and their future local television rights negotiation." (*Id.* ¶ 8.) At the December 1996 meeting, Plaintiff "explained the situation" to Defendant and also "presented to Steinbrenner the idea of starting a Yankees owned and operated network as a means of gaining negotiating leverage over Cablevision." (*Id.* ¶¶ 9, 10.) Defendant was "very intrigued by the idea," and "asked that Plaintiff work with the Yankees to figure out the viability of starting a new network." (*Id.* ¶¶ 10, 11.) Plaintiff alleges that Defendant:

> told Plaintiff that he would be compensated fairly for his efforts and that if, in fact, using Gutkowski's ideas, the Yankees did create a network, Plaintiff would be the one to build it and, afterward, would either run the network or, at a minimum, have a senior management position or be fairly compensated for his idea and efforts.

(*Id.* ¶ 11.)

#### 2. The February 1997 Meeting with David Sussman

In February 1997, Plaintiff met with David Sussman ("Sussman"), general counsel of the Yankees. (*Id.* ¶¶ 11, 12.) Plaintiff reiterated his concerns regarding Cablevision and his idea of creating a Yankees-owned network. (*Id.* ¶ 12.) Plaintiff alleges that "Sussman was also very interested in the idea, though he, like Steinbrenner, did not know how to go about creating a television network." (*Id.*)

#### 3. The May 1997 Meeting with Defendant

Plaintiff met with Defendant a second time in May 1997. (*Id.* ¶ 13.) Plaintiff alleges that, during this meeting, Defendant "was becoming more and more interested in starting a Yankees television network." (*Id.*) Plaintiff and Defendant, however, "decided to hold off discussing further development of a Yankees network until they could get an idea of the bargaining position Cablevision would adopt." (*Id.*)

---

[1] Plaintiff's factual allegations are assumed to be true and all reasonable inferences are drawn in his favor. *See In re Ades & Berg Group Investors*, 550 F.3d 240, 243 n.4 (2d Cir. 2008).

### 4. The March 1998 Memorandum

In February 1998, Defendant "called upon Gutkowski's industry expertise and requested that he prepare a memo to list and explain all of the local television broadcast and cable options available to the Yankees after the year 2000." (*Id.* ¶ 15.) On or about March 5, 1998, Plaintiff provided Defendant with a memorandum providing seven "detailed Yankees local television broadcast and cable options for the future." (*Id.* ¶ 16.) The first of these options "was the creation of a Yankees owned and operated television network." (*Id.*) "Included with this option were thorough five (5) and ten (10) year business plans laying out network creation and operations including specifics such as production, cable and advertiser sales, and marketing." (*Id.*)

### 5. The March 1998 Presentation by The Marquee Group

On or about March 10, 1998, Plaintiff and two of his partners at The Marquee Group made a presentation entitled "The New York Yankees & The Marquee Group: Maximizing Television Revenues" to Defendant and other Yankees executives. (*Id.* ¶ 17.) "The presentation explained, in depth, how to build a Yankees television network," and "Plaintiff, as architect of the network's model, covered all the facets of the implementation and management of the proposed Yankees network." (*Id.*)

Plaintiff alleges that Defendant "was impressed and asked Plaintiff to move forward on Phase One of Plaintiff's proposed plan," which "included developing viable local television broadcast and cable options." (*Id.* ¶¶ 18, 19.) For performing this service, "The Marquee Group would charge twenty-five thousand dollars ($25,000) per month for a minimum of six (6) months." (*Id.* ¶ 19.) "While Steinbrenner never signed the proposal he specifically requested that Plaintiff proceed under the terms — namely Phase One — of the contract." (*Id.*) Defendant, however, "only paid The Marquee Group for one month's worth of compensation — or $25,000 — for its work." (*Id.*)

Plaintiff alleges that "[a]t the time, Steinbrenner claimed that he was uncertain if he would ultimately choose to create a Yankees network, but told Plaintiff that if he did decide to start a network, Plaintiff would be the one to build it and either run it or be significantly involved in it." (*Id.*) Defendant "also promised that, in any event, Gutkowski would be compensated for his idea and efforts," and "said to Plaintiff and his partners, 'You are my guys, if it goes forward, I will do it with you.'" (*Id.*) "Plaintiff and his partners [in The Marquee Group] shook Steinbrenner's hand and departed to begin work on Phase One." (*Id.*) Plaintiff alleges that based on this agreement and Defendant's promises, Plaintiff "began laying the groundwork for the creation of a Yankees owned and operated television network." (*Id.* ¶ 20.)

### 6. The March 1998 Letter

On or about March 23, 1998, Plaintiff sent Defendant a letter "describing the duties he was then performing on behalf of a potential Yankees network." (*Id.* ¶ 21.) These duties included: (1) "analyzing potential strategic and financial media companies as equity and

3

distribution partners"; (2) "identifying key decision-makers at such companies with whom Steinbrenner should meet"; and (3) "continuing to develop a detailed financial *pro forma* for a Yankees owned and operated television network, including calculations for advertising and affiliate revenues, organization[,] and staffing." (*Id.*) Plaintiff's letter also "suggested and detailed certain specific steps to be taken next, including a press release — with a suggested date of April 1, 1998 — to announce a partnership between the Yankees and The Marquee Group, which would enable Gutkowski to conduct meetings on the Yankees' behalf." (*Id.*)

Although Defendant "declined to create or issue such a press release," Plaintiff alleges that Defendant "repeatedly assured Plaintiff that he would build the network with Plaintiff and that Plaintiff would run the network, or else be, and stay, significantly involved in the network." (*Id.* ¶ 22.) "Based upon these specific representations, Plaintiff continued diligently working for the benefit of Steinbrenner and the New York Yankees toward the creation of what ultimately became the YES [N]etwork." (*Id.*)

7. The May 1998 Consulting Agreement

On or about May 31, 1998, Plaintiff received a consulting agreement from the Executive Vice President of the Yankees, which provided that Plaintiff would consult for the Yankees regarding "all matters pertaining to the Yankees' future television rights." (*Id.* ¶ 23.) The term of this consulting agreement was six months. (*Id.* ¶ 24.) Plaintiff alleges that, notwithstanding the fact that he "was assured that this consulting agreement was merely the beginning of a much deeper involvement with the new Yankees network," he "was not contracted or hired to work for the network he created before it debuted several years later despite repeatedly contacting Defendant and requesting to be involved with building the network that he had created and then designed, as he was specifically promised." (*Id.* ¶¶ 23, 25.)

8. The October 2003 Consulting Agreement

Defendant ultimately started the YES Network with the financial assistance of several private equity groups. (*Id.* ¶ 26.) The YES Network first aired on or about March 19, 2002, with Leo Hindery, Jr. ("Hindery"), as its Chief Executive Officer. (*Id.* ¶ 28.) In April 2002, the YES Network filed suit against Cablevision. (*Id.* ¶ 30.) From approximately October 2003 through March 2004, Plaintiff was retained by the YES Network to act as a consultant in the lawsuit. (*Id.*) Plaintiff alleges that, to elicit his aid in the lawsuit, Randy Levine ("Levine"), President of the Yankees, "gave Plaintiff assurances that Plaintiff was Steinbrenner's choice to replace Mr. Hindery as CEO of YES." (*Id.* ¶¶ 30, 31.)

Hindery resigned as CEO of the YES Network in early 2004. (*Id.* ¶ 32.) At that time, "Steinbrenner and Levine repeatedly spoke with Plaintiff about his assuming the CEO position at YES." (*Id.*) "Despite such discussions, in September 2004 Tracy Dolgin replaced Leo Hindery, Jr. as the Chief Executive Officer of YES." (*Id.* ¶ 33.)

### 9. The November 2004 Consulting Agreement

On or about November 1, 2004, Plaintiff received a two-year consulting agreement from the YES Network, which expired on or about November 1, 2006. (*Id.* ¶ 34.) At that time, "Levine again reiterated his wish that Plaintiff be CEO of YES." (*Id.* ¶ 35.) Plaintiff alleges that, notwithstanding these statements, "[o]ver the course of the latest consulting agreement, it became clear to Plaintiff that no one at YES was making even the pretense of considering his suggestions." (*Id.*) Specifically, Plaintiff alleges that "[n]o one from YES sought out his counsel or in any way used Plaintiff in any substantive manner as contemplated by the consulting agreement." (*Id.* ¶ 36.) On or about February 10, 2005, Plaintiff "instigated a buyout" of the November 2004 consulting agreement. (*Id.*)

### 10. The 2007 Meeting with Levine

In 2007, Plaintiff met with Levine. (*Id.* ¶ 37.) During this meeting, Plaintiff asked that, "in accordance with past promises and assurances, that he be fairly compensated, in light of both Plaintiff's agreement with Steinbrenner and the fact that Plaintiff was the architect for YES." (*Id.*) Plaintiff alleges that Levine responded that Defendant would "'look to make something happen'" and "'do the right thing.'" (*Id.*) Defendant, however, "never again contracted, hired, or otherwise involved Plaintiff in any way with the network [Plaintiff] conceived of and created the model for, nor did they ever compensate Gutkowski for the reasonable value of his contribution to the creation and implementation of the YES [N]etwork." (*Id.*)

Plaintiff now alleges that "[o]ne measure of the fair and reasonable value of Plaintiff's service is the 2-3% equity interest traditionally paid to persons providing the kind of services provided by Plaintiff to Defendant." (*Id.* ¶ 38.)

### B. Procedural History

Plaintiff filed his complaint on August 28, 2009. (Doc. No. 1.) Defendant filed his motion to dismiss Plaintiff's complaint on November 6, 2009. (Doc. No. 16.) On December 1, 2009, Plaintiff filed his memorandum of law in opposition to Defendant's motion (Doc. No. 20), and on December 8, 2009, Defendant filed his reply memorandum of law (Doc. No. 21). Although Plaintiff has not filed a motion to amend his complaint, he does argue, in his memorandum of law in opposition to Defendant's motion, that any dismissal of his complaint should be without prejudice. (Doc. No. 20.)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in Plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a

notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. On the other hand, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Applying this standard, if Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

B. Motion to Amend

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend its pleadings by leave of the court, and further directs that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *accord McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-02 (2d Cir. 2007).

"Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here . . . there is no merit in the proposed amendments, leave to amend should be denied.").

III. DISCUSSION

Plaintiff's complaint alleges common law claims under New York law for breach of contract, unjust enrichment, quantum meruit, and fraud in the inducement. Defendant moves pursuant to Rule 12(b)(6) to dismiss all of these claims with prejudice.

The Court finds that Plaintiff's claims are inadequately pleaded in numerous respects. First, Plaintiff fails to plead adequately the compensation term of the putative agreement, which precludes Plaintiff from asserting his claim for breach of contract. Second, the purported oral agreement is unenforceable under New York's statute of frauds, which bars Plaintiff's breach of contract and quasi-contract claims. Third, Plaintiff's claim for fraudulent inducement fails to state a cause of action independent from Plaintiff's breach of contract claim. Fourth, all of Plaintiff's claims are untimely pursuant to New York's statute of limitations. Finally, insofar as

Plaintiff purports to make a motion to amend his complaint, this motion is denied as futile.

The Court will discuss each of these deficiencies in turn. For the reasons stated below, Defendant's motion to dismiss Plaintiff's complaint is granted, Plaintiff is denied leave to amend, and judgment shall be entered in favor of Defendant, closing this case.

### A. Definiteness

#### 1. Applicable Law

In New York, a contract must be sufficiently "definite" to be enforceable. *See generally Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08 Civ. 1115 (RJS), 2008 WL 4974864, at *4 (S.D.N.Y. Nov. 19, 2008).[2] "The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to . . . . [I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) (citation and internal quotation marks omitted); *accord Carruthers v. Flaum*, 450 F. Supp. 2d 288, 309 (S.D.N.Y. 2006) ("If the parties have not reached a final agreement on the fundamental terms of the deal, no *contract* has been formed." (emphasis in original)).

"The consideration to be paid under a contract is a material term." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, No. 06 Civ. 5693 (RJS), 2009 WL 3459187, at *12 (S.D.N.Y. Oct. 27, 2009); *accord Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("Price or compensation are material terms in a contract requiring definiteness."); *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293-94 (E.D.N.Y. 1998) (collecting cases); *Cooper Square Realty, Inc. v. A.R.S. Mgmt. Ltd.*, 581 N.Y.S.2d 50, 51 (1st Dep't 1992) ("As price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation.").

In this case, Plaintiff alleges that Defendant "told Plaintiff that he would be compensated fairly for his efforts," and, similarly, that Plaintiff would "be fairly compensated for his idea and efforts." (Compl. ¶ 11.) It is therefore undisputed that the purported oral agreement lacks a specifically alleged price or compensation term. "The failure to fix a sum certain, however, is not necessarily fatal to a contract." *GEM Advisors*, 2009 WL 3459187, at *12. The New York Court of Appeals has held that:

> [A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the

---

[2] Both parties rely solely on New York law in their moving papers. Where the parties' briefs assume that New York law controls, such "implied consent" is sufficient to establish choice of law. *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345 (RJS), 2009 WL 755292, at *6 n.6 (S.D.N.Y. Mar. 20, 2009). Accordingly, the Court applies New York law throughout this Memorandum and Order.

7

parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage. A price so arrived at would have been the end product of agreement between the parties themselves.

*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989) (citations and internal quotation marks omitted).

2. Analysis

Plaintiff fails to allege adequately the compensation term, and as a result, the purported oral agreement is indefinite as a matter of law.

Plaintiff's complaint states that "[o]ne measure of the fair and reasonable value of Plaintiff's service is the 2-3% equity interest traditionally paid to persons providing the kind of services provided by Plaintiff to Defendant." (Compl. ¶ 38.) Plaintiff, in his opposition memorandum of law, provides a second "alternative," arguing that "[a]n alternative measure is the compensation typically paid to a senior management executive in the cable television business performing the duties that Gutkowski did, in part, perform, and that the parties' agreement envisioned Gutkowski would perform." (Pl.'s Opp'n at 10.)

As an initial matter, these allegations are insufficient to plead the existence of an enforceable contract for the simple reason that Plaintiff fails to allege that the parties *actually agreed* to look to any extrinsic event, commercial practice, or trade usage to ascertain the price. *Cf. Rule v. Brine, Inc.*, 85 F.3d 1002, 1010 (2d Cir. 1996) ("[A]n enforceable contract may be created if the parties *agree* that a contract term, such as price, is to be set by reference to prevailing industry standards." (emphasis added)); *In re Maxwell Commc'n Corp.*, 198 B.R. 63, 68 (S.D.N.Y. 1996) ("Without an agreement as to the amount of compensation, such an agreement is unenforceable."). Thus, neither of the two alternative compensation measures offered by Defendant constitute "the end product of agreement between the parties themselves." *Cobble Hill*, 74 N.Y.2d at 483.

In any event, Plaintiff's proposed "alternative measures" for compensation are insufficient as a matter of law. Both measures look to custom or usage — the first figure stems from an allegation that a two to three percent equity interest is "*traditionally* paid to persons providing the kind of services provided by Plaintiff to Defendant" (Compl. ¶ 38 (emphasis added)), while the second figure is drawn from an argument that Plaintiff should be paid "the compensation *typically* paid to a senior management executive in the cable television business performing the duties that Gutkowski did, in part, perform, and that the parties' agreement envisioned Gutkowski would perform" (Pl.'s Opp'n at 10 (emphasis added)). Under New York law, however, "custom and usage evidence must establish that the omitted term is 'fixed and invariable' in the industry in question." *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir.

8

1984); *accord Cooper Square Realty*, 581 N.Y.S.2d at 51 ("Where no fee is stated, courts may not calculate a fee without custom and usage evidence to establish an extrinsic standard which is 'fixed and invariable' in the industry in question."); *see Argent Elec., Inc. v. Cooper Lighting, Inc.*, No. 03 Civ. 9794 (RMB), 2005 WL 2105591, at *5 (S.D.N.Y. Aug. 31, 2005); *Cleveland Wrecking*, 23 F. Supp. 2d at 294.

Plaintiff fails to allege the existence of a plausible "fixed and invariable" industry standard here. Indeed, Plaintiff's proposal of two *alternative* compensation measures renders implausible the existence of any one "fixed and invariable" industry standard. And each proposal, taken alone, does not rise to the requisite level of a "fixed and invariable" industry custom. The first measure provides for a two to three percent equity interest, which, by definition, is not fixed and invariable, and in this case, may speak to a difference of tens of millions of dollars. The second measure is merely an argument (as it is not found in Plaintiff's complaint) that Plaintiff wants to be paid the amount typically paid to people performing the duties that he performed here, an argument that likewise fails to render plausible the existence of any "fixed and invariable" industry standard.

In sum, the Court finds that Plaintiff's allegations that Defendant promised that Plaintiff would be "compensated fairly" or "fairly compensated," in conjunction with the allegation that "one measure" to calculate this "fair and reasonable value" is a two to three percent equity interest "traditionally paid to persons providing the kind of services provided by Plaintiff to Defendant," are insufficiently definite as a matter of law. *Cf. Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06 Civ. 5474 (JGK), 2008 WL 857492, at *15 (S.D.N.Y. Mar. 31, 2008) ("New York courts . . . will not give contractual effect to vague generalizations about compensation."). Such a holding is consistent with the many courts that have applied New York law to find similarly vague compensation terms to be indefinite and therefore unenforceable as a matter of law. *See, e.g.*, *United Res. Recovery Corp. v. Ramko Venture Mgmt. Inc.*, No. 07 Civ. 9452 (RWS), 2009 WL 2746232, at *6 (S.D.N.Y. Aug. 28, 2009) ("Gutierrez's vague and ambiguous statement that Kohut would be 'taken care of' is too indefinite to form a legally enforceable contract."); *Major League Baseball Props.*, 385 F. Supp. 2d at 271-72 (finding statement "we'll compensate you" too indefinite to establish a meeting of the minds between the parties); *Glanzer v. Keilin & Bloom LLC*, 722 N.Y.S.2d 540, 541 (1st Dep't 2001) (finding that a promise to pay the plaintiff "substantial income," "market rate," and "equity interest" was too indefinite to support claim for breach of contract); *Freedman v. Pearlman*, 706 N.Y.S.2d 405, 408 (1st Dep't 2000) (finding alleged promises of "fair compensation" and to "equitably divide the draw" too indefinite to be enforced); *Marraccini v. Bertelsmann Music Group Inc.*, 644 N.Y.S.2d 875, 877 (3d Dep't 1996) (finding "that the terms allegedly agreed to were far too indefinite to constitute an enforceable contract" where the plaintiff "agreed to disclose the details of her proposal in return for an indefinite payment, confidentiality, an undefined job[,] and an undefined equity stake").

Accordingly, Plaintiff's breach of contract claim, predicated on the existence of an

indefinite and therefore unenforceable oral agreement, is dismissed.

### B. Statute of Frauds

#### 1. Applicable Law

An unwritten agreement "to pay compensation for services rendered . . . in negotiating the purchase [of] . . . a business opportunity. . . or an interest therein" is void under New York's statute of frauds. N.Y. Gen. Oblig. L. § 5-701(a)(10). "Negotiating" is statutorily defined to include both "procuring an introduction to a party to the transaction" and "assisting in the negotiating or consummation of the transaction." *Id.*

In *Freedman v. Chemical Construction Corp.*, 43 N.Y.2d 260 (1977), the New York Court of Appeals held that the statute applied when the services rendered were limited to the provision of "connections," "ability," and "knowledge" to arrange, in that case, for the defendant "to meet 'appropriate persons' and somehow to procure for it the opportunity to build [a] multimillion dollar plant." *Id.* at 267 (internal quotation marks omitted); *see also id.* (holding that § 5-701(a)(10) applies if the "intermediary's activity is so evidently that of providing 'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in the enterprise").

More recently, in *Snyder v. Bronfman*, --- N.E.2d ----, 2009 WL 4016115 (N.Y. Nov. 23, 2009), the New York Court of Appeals held that § 5-701(a)(10) applied where the plaintiff alleged "that he devoted years of work to finding a business to acquire and causing an acquisition to take place — efforts that ultimately led to [the] defendant's acquisition of his interest in Warner Music." *Id.* Specifically, the plaintiff in *Snyder* alleged that he "developed . . . a series of business relationships with key figures in the corporate and investment banking communities," "met with [the] defendant and [the] defendant's other business associates to discuss possible acquisitions," "worked on several aborted deals," and "was a major contributor" to the defendant's eventual successful acquisition of Warner Music. *Id.* (internal quotation marks omitted). The plaintiff "identified the opportunity, persuaded defendant of its merits, helped to get debt financing[,] and obtained financial information from the target company [Warner Music.]" *Id.* The New York Court of Appeals held that "[i]n seeking reasonable compensation for [these] services, [the] plaintiff obviously seeks to be compensated for finding and negotiating the Warner Music transaction," and that such a "claim is of precisely the kind the statute of frauds describes." *Id.* So finding, the court affirmed the Appellate Division's dismissal of the plaintiff's claims.

#### 2. Analysis

Plaintiff's alleged services fall squarely within the purview of New York's statute of frauds as codified in § 5-701(a)(10) and interpreted by the New York Court of Appeals in *Freedman* and, more relevantly, in *Snyder*. "Courts interpreting section (a)(10) have generally held that where the transaction results in the acquisition of an existing enterprise or the formation of a new one, it is a business opportunity." *Mgmt. Recruiters of Boulder v. Nat'l Econ. Research Assocs. Inc.*,

No. 02 Civ. 3507 (BSJ), 2006 WL 2109478, at *6 (S.D.N.Y. July 24, 2006). Clearly, the formation of the YES Network constitutes a "business opportunity" as contemplated by § 5-701(a)(10).

In the face of this clear authority, Plaintiff nevertheless argues that the "services" that he provided to Defendant went beyond the "services" contemplated by § 5-701(a)(10). (*See* Pl.'s Opp'n at 12-14.) This argument fails under the clear statutory definition of "negotiating," which, as noted, includes both "procuring an introduction to a party to the transaction" and "assisting in the negotiating or consummation of the transaction." N.Y. Gen. Oblig. L. § 5-701(a)(10). Here, as in *Snyder*, Plaintiff is seeking compensation for services that are easily encompassed by this definition, such as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential business partners; (3) and being a "major contributor" to the eventual formation of the YES Network. (*See, e.g.*, Compl. ¶ 41 ("Plaintiff labored diligently toward the creation of YES. Plaintiff formulated detailed business plans covering each and every aspect of YES'[s] implementation and management. He cultivated contacts and developed viability schemes and options.").) Accordingly, Plaintiff's "claim is of precisely the kind the statute of frauds describes," *Snyder v. Bronfman*, 2009 WL 4016115, and as such, the alleged oral agreement is unenforceable under § 5-701(a)(10) of New York's statute of frauds. *Cf. Zeising v. Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (finding that "[c]ourts in this district have interpreted [similar] activities to fall squarely within the Statute of Frauds").

This deficiency is also fatal to Plaintiff's claims for unjust enrichment and quantum meruit. Under New York law, such claims are analyzed together as a single quasi-contract claim. *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345 (RJS), 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009). New York law is equally clear in holding that "[q]uasi-contract claims are barred by . . . § 5-701(a)(10)," *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 326 (S.D.N.Y. 2001). *See Prescient Acquisition Group, Inc. v. MJ Pub. Trust*, No. 05 Civ. 6298 (PKC), 2006 WL 2136293, at *5 (S.D.N.Y. July 31, 2006) ("In New York, a plaintiff may not assert an action under a theory of unjust enrichment in order to circumvent the writing requirement of the Statute of Frauds.").

Accordingly, the Court dismisses Plaintiff's claims for breach of contract, unjust enrichment, and quantum meruit.[3]

---

[3] Plaintiff, in his opposition memorandum, argues that "New York courts allow part performance to cure any deficiencies of an oral contract." (Pl.'s Opp'n at 15.) Although New York law provides that certain oral agreements may be removed from the statute of frauds by the equitable doctrine of partial performance, the New York Court of Appeals has "firmly stated" that there is no part performance exception to § 5-701(a)(10) of New York's statute of frauds. *Belotz v. Jeffries & Co., Inc.*, 213 F.3d 625, at *2 (2d Cir. 2000) (unpublished summary order) (collecting cases); *accord Alliance Media Group, Inc. v. Mogul Media, Inc.*, No. 02 Civ. 5252 (SLT), 2005 WL 1804473, at *3 n.1 (E.D.N.Y. July 28, 2005) (collecting cases); *Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, No. 03 Civ. 10254 (JFK), 2004 WL 2029399, at *5 (S.D.N.Y. Sept. 9, 2004) (collecting cases).

C. Fraudulent Inducement

Plaintiff's claim for fraudulent inducement likewise fails as a matter of law. "[U]nder New York law, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am. Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (citation and internal quotation marks omitted). "In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Id.* (citation and internal quotation marks omitted) (collecting cases).

Plaintiff alleges no plausible facts in support of his claim for fraudulent inducement other than that "Defendant had no intention of fulfilling the agreement with Plaintiff, as his subsequent behavior demonstrates [and that] Defendant knew that his promises and assurances were false when he made them." (Compl. ¶ 46; *see also id.* ¶ 1 ("[I]n order to induce Plaintiff to give his unique idea, and render services otherwise unavailable to Defendant, Defendant knowingly lied to Plaintiff . . . . Even at that time, Defendant had no intention of fulfilling his promise.").) Under the law just stated, these allegations are insufficient, and accordingly, Plaintiff's claim for fraudulent inducement is dismissed. *Cf. Ebusinessware, Inc. v. Tech. Servs. Group Wealth Mgmt. Solutions, LLC*, No. 08 Civ. 9101 (PKC), 2009 WL 5179535, at *10 (S.D.N.Y. Dec. 29, 2009) ("Under New York law, a fraud claim that mirrors a breach of contract claim will not ordinarily stand."); *Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *5 (S.D.N.Y. Nov. 10, 2009) ("[The] [p]laintiff's fraud claims are dismissed because 'none of [the plaintiff's fraud] allegations are distinct from those giving rise to the breach of contract claim [or] relate to facts collateral and extraneous to the contract.'" (quoting *Metro. Transp. Auth. v. Triumph Adver. Prod.*, 497 N.Y.S.2d 673, 675 (1st Dep't 1986))); *Miller v. Holtzbrinck Publishers, LLC*, No. 08 Civ. 3508 (HB), 2009 WL 528620, at *4 (S.D.N.Y. Mar. 3, 2009) ("Plaintiff's cause of action for fraudulent inducement sounds in breach of contract and constitutes an improper effort to circumvent the Statute of Frauds."); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996) ("Because the only fraud alleged arises out of the same facts that serve as the basis for the breach of contract claim, [the plaintiff's] fraud claim fails to state a claim for fraud on which relief can be granted.").[4]

---

[4] The Court rejects Plaintiff's argument that he has alleged facts sufficient to implicate the Second Circuit's opinion in *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13 (2d Cir. 1996). In that case, the Second Circuit held that, to maintain a claim sounding in fraud alongside a breach of contract claim, a party must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20 (citations omitted) (collecting cases). Plaintiff's complaint fails to allege facts sufficient to satisfy any of these conditions.

D. Statute of Limitations

New York's statute of limitations for contract and quasi-contract claims is six years, and it accrues upon breach. *See* N.Y. C.P.L.R. § 213(2); *see also ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997) ("[I]n New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered."). New York's statute of limitations for fraud claims is the longer of six years from the date on which the fraud occurred, or two years from discovery or the time when the plaintiff should have, with reasonable diligence, discovered the fraud. *See* N.Y. C.P.L.R. § 213(8).

In this case, all of Plaintiff's claims are barred by New York's statute of limitations. As the complaint itself alleges, Defendant agreed that, in the event he "decide[d] to start a [Yankees] network, Plaintiff would be the one to build it and either run it or be significantly involved in it." (Compl. ¶ 19.) Accordingly, the breach of contract and fraud could have occurred no later than March 19, 2002, the day that the YES Network debuted. As of that date, neither of the conditions of the purported oral agreement — that is, Plaintiff (1) running the network, or (2) being significantly involved in the network — had been satisfied. Plaintiff did not file this complaint until August 28, 2009, more than six years later. Accordingly, all of Plaintiff's claims are dismissed as untimely under New York's statute of limitations.[5]

E. Leave to Amend

Plaintiff, in his opposition memorandum, argues that any dismissal of his complaint should be without prejudice. (*See* Pl.'s Opp'n at 24-25.)

As an initial matter, Plaintiff's argument is procedurally inappropriate, as Plaintiff has failed to make a proper motion to amend his complaint. *Cf. In re Tamoxifen Citrate Antitrust Litig.* 466 F.3d 187, 220 (2d Cir. 2006) ("It is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss."). In any event, construing Plaintiff's argument as a motion to amend his complaint, the Court denies the motion on the grounds of futility, as the statute of frauds and the statute of limitations infirmities discussed above render futile any proposed amendment. *See Brady v. Lynes*, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *14 (S.D.N.Y. June 2, 2008) ("Because each of [the] [p]laintiff's causes of actions are deficient for a number of reasons, including the statute of limitations, it would be futile to replead any part of this Complaint."); *Sel-Leb Marketing, Inc. v. Dial*

---

[5] A defendant may be estopped from pleading "the Statute of Limitations where [the] plaintiff was induced by fraud, misrepresentations[,] or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 44 N.Y.2d 442, 448-49 (1978). In light of the fact that, according to Plaintiff's complaint, Plaintiff did not even *meet* with Defendant after March 1998, the Court finds no equitable basis for ignoring New York's statute of limitations.

13

*Corp.*, No. 01 Civ. 9250 (SHS), 2002 WL 1974056, at *6 (S.D.N.Y. Aug. 27, 2002) ("[I]t is clear that any amendment of the complaint would be futile because of the statute of frauds infirmity as discussed *infra.*"). These deficiencies, which are fatal to all of Plaintiff's claims, cannot be cured by amendment.

Furthermore, Plaintiff's opposition memorandum fails to identify any new plausible allegations — absent in the current complaint, but that would be present in any putative amended complaint — that might remedy the numerous deficiencies identified in this Memorandum and Order. This defect also renders futile any amendment of Plaintiff's complaint. As this Court has held before, "Rule 15(a) [of the Federal Rules of Civil Procedure] is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion." *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ 318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009). "At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a)." *Id.* Plaintiff has failed to do so here, and as such, his leave to amend is denied. Accordingly, all of the claims contained in Plaintiff's complaint are dismissed with prejudice.

IV. CONCLUSION

For the foregoing reasons, Defendant's motion is granted and Plaintiff's complaint is dismissed with prejudice. The motion located at docket number 16 shall be terminated. The Clerk of the Court shall enter judgment accordingly, and this case shall be closed.

SO ORDERED.

*/s/ Richard J. Sullivan*
RICHARD J. SULLIVAN
United States District Judge

Dated: January 26, 2010
New York, New York

\* \* \*

Plaintiff is represented in this matter by Neal Brickman, Ethan York Leonard, and Melinda May Dus, The Law Office of Neal Brickman, 317 Madison Avenue, 21st floor, New York, New York 10017. Defendant is represented by Christopher Emmanuel Duffy and Michael Philip Favretto, Boies, Schiller & Flexner LLP, 575 Lexington Avenue, New York, New York 10022.